UNITED STATES BANKRUPTCY COURT    WESTERN DISTRICT OF WISCONSIN

In Re:

                                       **Case No. 21-11157-cjf**

**MAUNESHA RIVER DAIRY, LLC,**
                **Debtor.**

## ORDER CONFIRMING PLAN OF REORGANIZATION

**IT APPEARING THAT** the Debtor, Mauensha River Dairy, LLC, filed a Plan of Reorganization, dated April 15, 2022, then filed a First Amended Plan of Reorganization, dated May 19, 2022; that the First Amended Plan of Reorganization was transmitted to creditors and equity holders, and was subsequently amended after the voting deadline as the Second Amended Plan of Reorganization, dated July 8, 2022 [Dkt. No. 248]; that only one party is adversely affected by the provisions of the Second Amended Plan of Reorganization, and that said party has filed a written consent to confirmation of the Second Amended Plan of Reorganization.

It having been determined after hearing on notice that the requirements for confirmation set forth in 11 U.S.C. § 1129(a) have been satisfied; so therefore,

**IT IS ORDERED THAT** the Second Amended Plan of Reorganization, dated July 8, 2022 [Dkt. No. 248] filed by Maunesha River Dairy, LLC is confirmed.

A copy of the confirmed plan is attached.

1

**The following disclosures are included in this Order to comply with Federal Rule of Bankruptcy Procedure 3020(c)(1) and are not otherwise a part of the Court's Order.**

An exculpation clause and third-party injunction are included in the Second Amended Plan at Article 9.2 and 9.4:

### 9.2    Exculpation.

The employees, advisors, attorneys, professionals, or agents of the Debtor do not have or will not incur any liability to any Creditor, Claimant or the Debtor for any act or omission in connection with, related to, or arising out of, the Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, or the property to be distributed under the Plan, except for willful misconduct, and in all respects, the employees, advisors, professionals, and agents are entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan.

### 9.4    Third Party Injunction Related to Guaranteed Creditors.

As long as the Debtor is not in default under the payment terms of the Plan, the Guaranteed Creditors are enjoined from undertaking any attempt to collect any portion of their respective Claims during the Plan Term from Ballweg or from any property in which Ballweg has an interest, except to the extent a Guaranteed Creditor has a valid right of setoff under Wisconsin law related to the Guaranteed Creditor's continuing obligation to Ballweg under a contract or program in existence prior to the Petition Date.

###

4858-8259-0506, v. 1

**UNITED STATES BANKRUPTCY COURT**        **WESTERN DISTRICT OF WISCONSIN**

In the Matter of:                                                   In Bankruptcy No.

                                                                          **21-11157-CJF**

**MAUNESHA RIVER DAIRY, LLC**,

                    **Debtor**.

**SECOND AMENDED
PLAN OF REORGANIZATION
MAUNESHA RIVER DAIRY, LLC
(July 8, 2022)**

**MURPHY DESMOND S.C.**
Attorneys for Maunesha River Dairy, LLC
Jane F. (Ginger) Zimmerman
State Bar Number:  1012103
Nicole I. Pellerin
State Bar Number:  1078892
33 East Main Street, Suite 500
P.O. Box 2038
Madison, WI  53701-2038
(608) 257-7181

Dated this 8th day of July 2022.

# TABLE OF CONTENTS

1.  DEFINITIONS ..................................................................................................1

2.  DESIGNATION OF CLAMS AND INTERESTS ..........................................11

    *2.1    Unclassified Administrative Claims.................................................11*

    *2.2    Classified Claims. ...........................................................................12*

3.  TREATMENT OF UNCLASSIFIED ADMINISTRATIVE CLAIMS ...........12

    *3.1    Administrative Claims......................................................................12*

    *3.2    Post-Confirmation Expenses............................................................13*

    *3.3    Payment of US Trustee Fees. ...........................................................14*

4.  TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS.....................14

    *4.1    Class One (BMO Secured Claim). ...................................................14*

    *4.2    Class Two (FMUB Secured Claim). .................................................17*

    *4.3    Class Three (SBA Secured Claim). ..................................................19*

    *4.4    Class Four (Agri-Max Secured Claim).............................................20*

    *4.5    Class Five (Ascentium Secured Claim).............................................21*

    *4.6    Class Six (CNH Secured Claim). .....................................................21*

    *4.7    Class Seven (Caterpillar Secured Claim)..........................................22*

    *4.8    Class Eight (non-priority Unsecured Claims). ..................................23*

    *4.9    Class Nine (Member Interests). .......................................................24*

5.  MEANS OF IMPLEMENTING AND EXECUTING THE PLAN ..................24

    *5.1    Power and Authority of the Reorganized Debtor. .............................24*

    *5.2    Operation of Debtor's Business........................................................24*

5.3      Post-Confirmation Management. ..................................................29

5.4      Post-Confirmation Financial Reporting. ........................................30

6.   RETENTION OF JURISDICTION ......................................................30

6.1      Post-Confirmation of the Court. ...................................................30

6.2      Allowance and Liquidation of Claims ...........................................31

6.3      Determination of Tax Liability. ....................................................31

6.4      Applications by Professionals. ......................................................31

6.5      Executory Contract Motions. .......................................................31

6.6      Plan Interpretation. .....................................................................31

6.7      Plan Implementation. ..................................................................31

6.8      Plan Modification. ......................................................................32

6.9      Adjudication of Controversies. .....................................................32

6.10     Injunctive Relief. .......................................................................32

6.11     Correct Minor Defects. ...............................................................32

6.12     Post Confirmation Orders Regarding Confirmation. ........................32

6.13     Powers Granted Pursuant to the Code. ..........................................32

6.14     Consummation. ..........................................................................33

6.15     Final Decree. .............................................................................33

7.   SPECIAL LIQUIDATION REMEDY FOR BANKS. ...............................33

7.1      Summary. ..................................................................................33

7.2      Delinquency and Default. ............................................................34

7.3      Liquidating Trustee. ....................................................................34

7.4      Powers and Duties of Liquidating Trustee. .....................................35

7.5      Liquidating Trustee's Use of Cash Collateral or Protective Advances. ...............35

*7.6*    *Final Accounting.*..................................................................................*36*

8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.............................................36

*8.1*    *Rejected Executory Contracts and Unexpired Leases.*.........................................*36*

*8.2*    *Claim for Rejection Damages.*.................................................................*36*

*8.3*    *Assumed Executory Contracts and Unexpired Leases.*.........................................*37*

*8.4*    *Cure and Effect of Assumption.*..............................................................*37*

9.    DISCHARGE, EXCULPATION AND INJUNCTIONS .................................................38

*9.1*    *Discharge of Debtor.*..........................................................................*38*

*9.2*    *Exculpation.*..................................................................................*38*

*9.3*    *Injunction.*...................................................................................*39*

*9.4*    *Third Party Injunction Related to Guaranteed Creditors.*.....................................*39*

10.    RULES OF INTERPRETATION ..................................................................40

11.    MISCELLANEOUS .............................................................................41

*11.1*    *Headings.*...................................................................................*41*

*11.2*    *Singular/Plural.*.............................................................................*41*

*11.3*    *Gender.*.....................................................................................*41*

*11.4*    *Computation of Time Periods.*...............................................................*41*

Maunesha River Dairy, LLC, the Debtor in this case, respectfully proposes the following Plan pursuant to 11 U.S.C. § 1123:

## 1.    DEFINITIONS

For purposes of this Plan, capitalized terms shall have the meanings set forth below, unless the context clearly indicates otherwise.  All other terms not defined herein shall have the definitions assigned by the Code, or, if not defined therein, in common usage.  Accounting terms not otherwise defined herein, or partly defined herein to the extent not so defined, shall have the respective meanings given to them under GAAP.

1.1    **"Administrative Claim"** shall mean a Claim for compensation, charges, and/or expenses under § 503(b) of the Code that is entitled to priority in payment pursuant to § 507(a)(1) of the Code.

1.2    **"Agri-Max"** shall mean Agri-Max Financial Services, LP.

1.3    **"Agri-Max Collateral"** shall mean the assets of the Debtor in which Agri-Max holds a perfected security interest described in the Agri-Max Documents to secure repayment of the Agri-Max Secured Claim.

1.4    **"Agri-Max Documents"** shall mean the agreements, instruments and documents, all as amended from time to time, between the Debtor and Agri-Max, including, without limitation, the promissory note, business loan agreement, security agreement, assignments, and UCC Financing Statements, and any renewals and extensions to such documents.

1.5    **"Agri-Max Secured Claim"** shall mean Agri-Max's pre-Petition Date and post-Petition Date Allowed Secured Claim arising under the Agri-Max Documents.

1.6    **"Allowed Administrative Claim"** shall mean all or any portion of an Administrative Claim that is an Allowed Claim.

**1.7** **"Allowed Claim"** shall mean all or any portion of any Claim:

(a)     as to which no proof has been filed with the Court and the liquidated and non-contingent amount of which is scheduled by the Debtor as undisputed and is not subject to a counterclaim or a right of setoff by the Debtor; or

(b)     as to which proof has been timely filed in a liquidated amount with the Court, or late filed with leave of the Court, after notice and a hearing, provided that: (1) no objection to the allowance of such Claim, motion to expunge such Claim, counterclaim or right of setoff has been interposed by any party-in-interest; or (2) if such objection, motion, counterclaim or right of setoff has been filed or asserted, such objection, motion, counterclaim or right of setoff has been overruled by a Final order, or such Claim otherwise has been allowed by a Final Order.

**1.8** **"Allowed Priority Claim"** shall mean a Priority Claim that is an Allowed Claim.

**1.5** **"Allowed Secured Claim"** shall mean a Secured Claim that is an Allowed Claim.

**1.6** **"Allowed Unsecured Claim"** shall mean an Unsecured Claim that is an Allowed Claim.

**1.7** **"Ascentium"** shall mean Ascentium Capital, LLC.

**1.8** **"Ascentium Collateral"** shall mean the assets of the Debtor in which Ascentium holds a perfected purchase money security interest described in the Ascentium Documents to secure repayment of the Ascentium Secured Claim.

**1.9** **"Ascentium Documents"** shall mean the agreements, instruments and documents, all as amended from time to time, between the Debtor and Ascentium including,

2

without limitation, the Equipment Finance Agreement and UCC Financing Statements, and any renewals and extensions to such documents.

**1.10   "Ascentium Secured Claim"** shall mean Ascentium's pre-Petition Date Date Allowed Secured Claim arising under the Ascentium Documents.

**1.11   "Avoidance Action"** shall mean any and all Claims or causes of action made under or pursuant to §§ 544, 545, 546, 547, 548, 549, 550, 551 or 553 of the Code, including any Claims or causes of action brought under Chapters 180 or 242 of the Wisconsin Statutes.

**1.12   "Ballweg"** shall mean Dennis E. Ballweg.

**1.13   "Ballweg Real Estate"** shall mean the real estate owned by Ballweg and leased by the Debtor under the Farm Lease consisting of the Dairy Facility, Bare Land and Sun Prairie Land.

**1.14   "Banks"** shall mean BMO and FMUB.

**1.15   "Bare Land"** shall mean the vacant land owned by Ballweg consisting of approximately 226 acres of vacant land located at Twin Lane Road and Greenway Road adjacent to the Dairy Facility in the Town of Bristol, Dane County, Wisconsin, consisting of the following Tax Key Numbers as of the Confirmation Date: 012/0911-243-9200-6, 012/0911-244-8000-9, 012/0911-244-8500-4, 012/0911-244-9000-7, 012/0911-244-9500-2, 012/0911-251-8500-5, and 012/0911-251-8100-9.

**1.16   "BMO"** shall mean BMO Harris Bank N.A. collectively.

**1.17   "BMO Collateral"** shall mean the assets of the Debtor in which BMO holds a perfected security interest described in the BMO Documents to secure repayment of the BMO Secured Claim.

**1.18** **"BMO Documents"** shall mean the agreements, instruments and documents, all as amended from time to time, between the Debtor and BMO, including without limitation, loan agreements, promissory notes, security agreements, guaranties, forbearance agreements, UCC financing statements and any renewals, modifications, extensions and restatements to such documents, and any documents between Ballweg and BMO the terms of which are incorporated into any such documents, including mortgages and assignments of rents affecting the Bare Land.

**1.19** **"BMO Secured Claim"** shall mean BMO's pre-Petition Date and post-Petition Date Allowed Secured Claim arising under the BMO Documents.

**1.20** **"BMO New Notes"** shall mean the three notes the Debtor will issue under the Plan to BMO on the Effective Date, or as soon thereafter as practicable.

**1.21** **"Business Day"** shall mean any day except Saturday, Sunday or any other day on which commercial banks are authorized by law to close in the State of Wisconsin.

**1.22** **"Case"** shall mean the case for reorganization of the Debtor commenced by the filing of a Voluntary Petition Under Chapter 11 on or about the Petition Date, now pending in the Court and entitled, "In the Matter of Maunesha River Dairy, LLC, Case No. 21-11157-CJF"

**1.23** **"Cash"** shall mean cash, cash equivalents (including personal checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified check and money orders) and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

**1.24** **"Cash Collateral Creditors"** shall mean BMO, FMUB and Agri-Max.

**1.25** **"Chapter 11"** shall mean Chapter 11 of Title 11, United States Code.

**1.26** **"Claimant"** shall mean the holder of a Claim.

**1.27** **"Claims Bar Date"** shall mean August 20, 2021, the date established by a Final Order as the last date for filing proofs of claim against the Debtor, except:

(a)    as extended by Final Order of the Court, and

(b)    with respect to Claims arising from the rejection of an Executory Contract (other than Executory Contracts rejected pursuant to this Plan), the date established by the Court's order authorizing such rejection, but in no event prior to the date otherwise generally established by Final Order.

**1.28** **"Class"** shall mean a category of holders of Claims or Interests defined in Section 2.2 of the Plan.

**1.29** **"CNH"** shall mean CNH Industrial Capital America LLC.

**1.30** **"CNH Collateral"** shall mean the Case IH Magnum 280 Tractor ("Magnum") and Cash IH 330 34 foot Turbo TI, Model 330 ("Turbo") in which CNH holds perfected purchase money security interests under the CNH Documents.

**1.31** **"CNH Documents"** shall mean two separate Retail Installment Contract and Security Agreements (Fixed Rate) dated respectively, August 23, 2016 (Magnum) and November 14, 2018 (Turbo), and corresponding UCC Financing Statements.

**1.32** **"CNH Secured Claim"** shall mean CNH's pre-Petition Allowed Secured Claim arising under the CNH Documents.

**1.33** **"Code"** shall mean Title 11, United States Code, as amended.

**1.34** **"Confirmation Date"** shall mean the date on which the Confirmation Order is entered on the docket of the Court.

**1.35** **"Confirmation Hearing"** shall mean the hearing held by the Court, after notice, on confirmation of the Plan.

**1.36** **"Confirmation Order"** shall mean the order of the Court confirming the Plan pursuant to § 1129 of the Code.

**1.37** **"Court"** shall mean the United States Bankruptcy Court for the Western District of Wisconsin acting in this case, including the United States Bankruptcy Judge presiding in the case of the Debtor, and/or the United States District Court of which said Bankruptcy Court is a unit.

**1.38** **"Dairy Facility"** shall mean the buildings and improvements, together with approximately 80 acres owned by Ballweg and used by the Debtor in its dairy operations at Twin Road Lane and Greenway Road in the Town of Bristol, Dane County, Wisconsin, consisting of the following Tax Key Numbers as of the Confirmation Date: 012/0911-252-8000-9 and 012/0911-252-8500-4

**1.39** **"Debtor"** shall mean Maunesha River Dairy, LLC.

**1.40** **"Debtor-In-Possession"** shall mean Maunesha River Dairy, LLC, in its capacity as Debtor-In-Possession, pursuant to Chapter 11 of the United States Code, from and after the Petition Date.

**1.41** **"Disclosure Statement"** shall mean that certain Disclosure Statement relating to the Plan filed by the Debtor in the Case and approved by order of the Court as containing adequate information in accordance with § 1125 of the Code.

**1.42** **"Disputed Claim"** shall mean any Claim:

(a)     to which an objection has been filed with respect to all or any portion of such Claim, or to which an application or adversary proceeding to equitably subordinate or

6

otherwise limit recovery of all or any portion of such Claim has been filed, on or before the

Effective Date or any other date fixed by order of the Court and which objection or application

has not been withdrawn or determined by Final Order of the Court,

(b)    that is listed on the Debtor's schedules of assets and liabilities as disputed,

contingent or unliquidated and as to which a proof of claim has been filed with the Bankruptcy

Court or

(c)    that is not an Allowed Claim.

**1.43**    **"Distribution Date"** shall mean any date on which a distribution is required to

be made under the Plan.

**1.44**    **"Effective Date"** shall mean that date on which the Order of Confirmation

becomes final and non-appealable.

**1.45**    **"Estate"** shall mean the estate of the Debtor created in the Case by operation of

§ 541 of the Code.

**1.46**    **"Farm Lease"** shall mean the triple net Farm Lease dated May 15, 2010

between Ballweg and the Debtor, under which the Debtor leases the Ballweg Real Estate.

**1.47**    **"Final Cash Collateral Order"** shall mean the Order Approving Stipulation

for Final Order Authorizing the Use of Cash Collateral and Granting Adequate Protection

entered in the Case by the Court on June 25, 2021 at Doc. No. 58, together with all subsequent

orders extending, amending or continuing the same.

**1.48**    **"Final Order"** shall mean an order or a judgment that has not been reversed,

stayed, modified, or amended and as to which:

(a)      the time to appeal or seek review, re-argument or rehearing has expired and has not been extended and as to which no appeal or petition for certiorari, review or rehearing is pending, or

(b)      if an appeal, review, re-argument, rehearing or certiorari of the order or judgment has been sought, the order or judgment has been affirmed or the request for review, re-argument, rehearing or certiorari has been denied and the time to seek a further appeal, review, re-argument, rehearing or certiorari has expired, as a result of which such order or judgment shall have become final and non-appealable in accordance with applicable law.

1.49    **"FMUB"** shall mean Farmers & Merchants Union Bank.

1.50    **"FMUB Collateral"** shall mean the assets of the Debtor in which FMUB holds a perfected security interest described in the FMUB Documents to secure repayment of the FMUB Secured Claim.

1.51    **"FMUB Documents"** shall mean the agreements, instruments and documents, all as amended from time to time, between the Debtor and FMUB, including without limitation, guaranties, security agreements, UCC Financing Statements and any renewals, modifications and extensions to such documents, and any documents between Ballweg and FMUB the terms of which are incorporated into, or guaranteed by any such documents, including notes, loan agreements, mortgages and assignments of rents affecting the Ballweg Real Estate.

1.52    **"FMUB Secured Claim"** shall mean FMUB's pre-Petition Date and post-Petition Date Allowed Secured Claim arising under the FMUB Documents.

1.53    **"FMUB New Notes"** shall mean the two notes the Debtor and Ballweg will issue under the Plan to FMUB on the Effective Date, or as soon thereafter as practicable.

**1.54** **"GAAP"** shall mean generally accepted accounting principles in the United States of America in effect from time to time.

**1.55** **"Governmental Units"** shall have the meaning set forth in 11 U.S.C. § 101(27).

**1.56** **"Guaranteed Creditors"** shall mean Creditors of the Debtor holding Claims on which Ballweg was personally obligated on the Petition Date, whether as borrower, co-borrower, purchaser, lessee, guarantor or other personal obligation.

**1.57** **"Herd Account"** shall mean the escrow account established at BMO under the Interim Order and Final Cash Collateral Order to hold cull cow proceeds.

**1.58** **"Interests"** shall mean the rights of the owner of the limited liability interests in the Debtor.

**1.59** **"Interim Order"** shall mean the Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection entered in the Case by the Court on June 3, 2021 at Doc. No. 40.

**1.60** **"Lien"** shall have the meaning assigned to such term in the Code.

**1.61** **"Maunesha"** shall mean Maunesha River Dairy, LLC, the Debtor in the case.

**1.62** **"Payroll Order"** shall mean the Order Authorizing Payment of Pre-Petition Employee Obligations entered in the Case by the Court on June 3, 2021 at Doc. No. 41.

**1.63** **"Plan"** shall mean this Plan of Reorganization, filed by the Debtor, in its present form, or as it may be further amended, supplemented, or modified from time to time.

**1.64** **"Plan Term"** shall mean the period of time from the Effective Date to the last day of the month 61 months after the Effective Date.

**1.65** **"Petition Date"** shall mean May 27, 2021.

**1.66**    **"Priority Claim"** shall mean a Claim having priority by virtue of § 507(a) of the Code, other than an Administrative Expense Claim or a Tax Claim.

**1.67**    **"Property of the Estate"** shall have the meaning assigned to such term in § 541 of the Code.

**1.68**    **"Reorganized Debtor"** shall mean the Debtor/Debtor-in-Possession after the Effective Date.

**1.69**    **"SBA"** shall mean the Small Business Administration, an agency of the United States of America.

**1.70**    **"Secured Claim"** shall mean a Claim arising on or before the Petition Date (or thereafter with approval of the Court) that is secured by a valid Lien on Property of the Estate and is not void or voidable under any state or federal law, including any provision of the Code, or subject to set off under § 553 of the Code, but only to the extent of the value (which is either agreed to by the Debtor pursuant to this Plan, or, in the absence of agreement, has been determined under § 506 of the Code by a Final Order) of the interest of the holder of such Claim in Property of the Estate or to the extent of an amount subject to set off.

**1.71**    **"Stade Appraisal"** shall mean the appraisal commissioned by BMO in September 2021 from The Bill Stade Auction & Realty Co. on machinery, equipment, livestock and feed inventory owned by the Debtor and Ballweg.

**1.72**    **"Sole Member"** shall mean Ballweg, the sole member in the Debtor.

**1.73**    **"Sun Prairie Land"** shall mean the vacant land owned by Ballweg consisting of approximately 88 acres of vacant land located in the Town of Sun Prairie, Dane County, Wisconsin, consisting of the following Tax Key Number as of the Confirmation Date: 058/0811-013-8550-0.

**1.74** **"Tax Claim"** shall mean any Claim entitled to priority under § 507(a)(8) of the Code.

**1.75** **"Unsecured Claim"** shall mean a Claim arising on or before the Petition Date for an unsecured debt, demand or liability of any character whatsoever, including, without limitation, any Claim secured by a Lien which is determined by the Court to be preferential or otherwise avoidable, any Claim arising from the recovery by the Estate of any Avoidance Actions, or any Claim in excess of the Claimant's Allowed Secured Claim.

**1.76** **"UST Fees"** shall mean the fees the Debtor is required to pay to the United States Trustee under 28 U.S.C. § 1930.

**2.** **DESIGNATION OF CLAMS AND INTERESTS**

The holders of all Claims against or Interests in the Debtor, of whatever nature, regardless of whether scheduled or liquidated, absolute or contingent, including all Claims arising from the rejection of executory contracts or unexpired leases, whether or not resulting in an Allowed Claim or Interest, shall be bound by the provisions of the Plan and all such Claims and Interests are hereby either designated as unclassified administrative claims or classified as follows:

**2.1** **Unclassified Administrative Claims.**

The administrative claims against the Debtor are unclassified.  The administrative claimants are: Murphy Desmond S.C., Compeer Financial ACA, and JMS Dairy Business Consulting, LLC related to professional fees; and Eastland Feed and Grain LLC, Furst-McNess Company, Landmark Services Cooperative, and Animart, LLC  related to Allowed § 503(b)9 Claims.

11

**2.2    Classified Claims.**

2.2.1    **Class One Claims**.  Class One consists of the BMO Secured Claim.

2.2.2    **Class Two Claims**.  Class Two consists of the FMUB Secured Claim.

2.2.3    **Class Three Claims**.  Class Three consists of the SBA Secured Claim.

2.2.4    **Class Four Claims**.  Class Four consists of the Agri-Max Secured Claim.

2.2.5.    **Class Five Claims**.  Class Five consists of the Ascentium Secured Claim.

2.2.6    **Class Six Claims.**  Class Six consists of the CNH Secured Claim.

2.2.7    **Class Seven Claims.**  Class Seven consists of the Caterpillar Secured Claim.

2.2.8    **Class Eight Claims.**  Class Eight consists of the non-priority Unsecured Claims.

2.2.9    **Class Nine Member Interests.**  Class Nine consists of all interests of the Sole
Member in the Debtor.

**3.    TREATMENT OF UNCLASSIFIED ADMINISTRATIVE CLAIMS**

**3.1    Administrative Claims.**

Except to the extent that a holder of an Allowed Administrative Claim has agreed to a
different treatment of such Claim, each holder of an Allowed Administrative Claim will
receive Cash equal to the unpaid portion of such Allowed Administrative Claim, without
interest, on the later to occur of:

(a)    the Effective Date;

(b)    fifteen (15) calendar days after such Administrative Claim becomes an Allowed
Claim pursuant to a Final Order; or

(c)    in installments as agreed to between the claimant and the Debtor.

No Administrative Claim shall become an Allowed Administrative Claim unless an
application, request or proof has been filed with the Court and served upon the Reorganized

Debtor within thirty (30) calendar days following the Effective Date, except that no Administrative Claim under § 503(b)9 shall become an Allowed Administrative Claim unless the application or motion for such claim has been approved by the Court.

**ANY HOLDERS OF ADMINISTRATIVE CLAIMS WHO ARE REQUIRED TO FILE A REQUEST FOR PAYMENT OF SUCH CLAIM AND WHO DO NOT FILE SUCH REQUEST FOR PAYMENT WITHIN THE TIME FRAMES SET FORTH IN THE PRECEDING PARAGRAPH, UNLESS EXTENDED BY ORDER OF THE COURT, SHALL BE FOREVER BARRED FROM ASSERTING SUCH CLAIM AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR THE ESTATE, AND FROM RECEIVING ANY DISTRIBUTION UNDER THE PLAN ON ACCOUNT OF SUCH CLAIM.  NOTHING HEREIN SHALL AUTHORIZE OR EXCUSE THE UNTIMELY FILING OF ANY CLAIM WHICH WAS REQUIRED TO BE FILED IN THIS CASE PURSUANT TO ANY BAR DATE ORDER.**

    **3.2    Post-Confirmation Expenses.**

All fees and expenses incurred by professional persons after the Effective Date shall be paid by the Reorganized Debtor, without further order of the Court, unless the Reorganized Debtor objects to such fees and expenses within fourteen (14) days after receipt of a detailed written invoice requesting payment.  Any objections to such fees and expenses shall be resolved by the Court, or, if the Court is held to lack jurisdiction, by any court with competent jurisdiction.

**3.3    Payment of US Trustee Fees.**

The Debtor will pay any outstanding post-petition fees under 28 U.S.C. § 1930(a)(6) to the United States Trustee on or before the Effective Date.  The Reorganized Debtor will pay all post-confirmation fees to the United States Trustee when due as required by law.  The Debtor has included sufficient amounts in its projection for general operating expenses to pay such fees.

**4.    TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

**4.1    Class One (BMO Secured Claim).**

On, or about, the Effective Date, BMO will provide Maunesha with the Herd Expansion Loan in accordance with the terms and provisions of Section 5.2.1, below, and pursuant to such additional documents and requirements ordinarily and customarily included in similar agricultural loans in BMO's sole discretion.  After providing the Herd Expansion Loan, the BMO Secured Claim will have an outstanding balance of no less than $4,642,394.89, plus interest, attorneys' fees and expenses.   The BMO Secured Claim will be split into the BMO New Notes and paid as follows:

a.      $1,145,059.45 (FSA Guaranteed Note).  Payable at 4.75% per annum amortized over 10 years with monthly payments of principal and interest of at least $12,005.69;

b.      $1,666,146.24 (Chattel Note).  Payable at 4.75% per annum amortized over 10 years with monthly payments of principal and interest of at least $17,469.17; and

c.      $1,792,394.89 (Balance Note).  Payable at 4.75% per annum amortized over 30 years with monthly principal and interest payments of at least $9,349.98.

The allocations of principal and interest rates described herein or to the BMO New Notes shall not affect BMO's security interest in any type of collateral.  BMO shall retain its security

14

interest in all collateral until the entire balance of the BMO's Secured Claim is paid in full, and the obligation owed to BMO under each such BMO New Note shall be cross-collateralized and cross-defaulted with each of the other BMO New Notes. Notwithstanding the foregoing, Maunesha acknowledges that the FSA Guaranteed Note shall be secured first by Maunesha's farm equipment, with any balance remaining after application of proceeds of said farm equipment being secured by the remaining BMO Collateral behind the Chattel Note and Balance Note.

The BMO New Notes will be due in full on the first day of the 61st month after the Effective Date. Payments to BMO on the BMO New Notes will be made by milk assignment and will commence in the first full calendar month following the Effective Date, provided that there is no gap in monthly payments between the last adequate protection payment under the Final Cash Collateral Order (during the pendency of this case) and the first payment due against the BMO New Notes. Maunesha will process all paperwork necessary to put the Milk Assignment in place on the Effective Date or as soon thereafter as practicable. In the event there are additional fees or expenses owed to BMO on the Effective Date, those amounts will be added to the amounts due and owing under the Balance Note. The BMO New Notes will be secured by all security interests in the BMO Collateral in effect as of the Petition Date and the post-petition Liens granted by the Court in the Final Cash Collateral Order. That is, BMO shall continue to have a security interest in all assets of Maunesha, in the same priority and character as BMO had before the Petition Date. BMO also has and shall continue to have a replacement Lien in all assets of Maunesha accruing after the Petition Date, including but not limited to crops, livestock, equipment, inventory, documents, general intangibles, accounts, control rights, cash collateral, and any proceeds thereof owned by Maunesha. BMO's post-Petition Date Lien is perfected as of the Petition Date, and BMO may, but is not required to,

15

file a financing statement with the Wisconsin Department of Financial Institutions memorializing its post-Petition Date Lien. BMO shall have a first position Lien in the cows purchased with the Herd Expansion Loan under its existing and any future security interests. The priority of BMO's security interests is subject only to properly perfected pre-Petition Date purchase money security interests, and any properly perfected purchase money security interest that may accrue post-confirmation.

On the Effective Date, Ballweg will grant to BMO mortgages on the Dairy Facility and Sun Prairie Land, and will execute a Modification of Mortgage as to BMO's existing mortgage on the Bare Land to remove any maximum lien limitation therein. All BMO mortgages and modifications on Ballweg Real Estate contemplated in the Plan will not contain any maximum lien amounts or otherwise be limited in scope, with such mortgages to be junior to the existing mortgages in favor of FMUB and SBA, only as provided in and subject to the terms of that certain Intercreditor Agreement between BMO and FMUB discussed in Section 5.2.1, below.

Except to the extent expressly modified by this Plan, all loan documents between BMO and Maunesha shall remain in full force and effect. BMO shall retain its first-position security interest in Maunesha's personal property to secure the BMO Secured Claim and all rights and remedies under its prepetition loan documents. Maunesha will execute any other documents reasonably requested by BMO to effectuate the terms of the Plan. Maunesha will maintain all deposit accounts post confirmation with BMO, except for the property tax escrow to which it contributes under the Farm Lease held at FMUB. All transactions relating to Maunesha's operations through the term of this Plan shall be made through the deposit account(s) held at BMO. BMO shall retain all Liens in the BMO Collateral securing repayment of the BMO Secured Claim as long as there is any balance owing on the BMO Secured Claim. The Debtor

reserves the right to prepay the balance due on the BMO Secured Claim at any time after the Effective Date provided the payment can be made without jeopardizing the payments due under the Plan.

Notwithstanding the limitation in section 9.4, below, BMO shall be subject to the Third Party Injunction Related to Guaranteed Creditors as long as the Debtor is not in default under the terms of the Plan, generally, rather than limiting BMO's ability to take action against Ballweg to a default under the payment terms of the Plan. The BMO Secured Claim is impaired under the Plan.

### 4.2    Class Two (FMUB Secured Claim).

On the Effective Date, FMUB's Secured Claim will have an outstanding balance of no less than $4,986,609.66, plus interest, attorneys' fees and expenses.   The FMUB Secured Claim will be split into the FMUB New Notes to be entered by Maunesha and Ballweg, and paid as follows:

a.    $500,000.00 (Short Term Note).  Payable at 4.75% per annum amortized over 10 years with monthly payments of principal and interest of at least $5,242.39;

b.    $1,622,338.93 (Dairy Expansion Note).  Payable at 4.75% per annum amortized over 20 years with monthly payments of principal and interest of at least $10,483.94.

c.    $2,864,470.73 (Real Estate Note).  Payable at 4.75% per annum amortized over 20 years with monthly principal and interest payments of at least $18,509.59.

FMUB shall retain its security interest in the FMUB Collateral until the entire balance of the FMUB Secured Claim is paid in full, and the obligation owed to FMUB under each such FMUB New Note shall be cross-collateralized and cross-defaulted with the other FMUB New

Note, limited only by and subjected to the i)Third Party Lender Agreement dated May 2, 2011 between FMUB and Wisconsin Business Development Finance Corp. recorded with the Dane County Register of Deeds as Document No. 4763974, and ii) Intercreditor Agreement between BMO and FMUB, discussed in Section 5.2.1. below.

The FMUB New Notes will be due in full on the first day of the 61st month after the Effective Date.   Payments to FMUB on the FMUB New Notes will be made by milk assignment and will commence in the first full calendar month following the Effective Date, provided there is no gap between the last adequate protection payment under the Final Cash Collateral Order (during the pendency of this Case) and the first payment against the FMUB New Notes.   Maunesha will process all paperwork necessary to put the milk assignment in place on the Effective Date or as soon thereafter as practicable.   In the event there are additional fees or expenses owed to FMUB on the Effective Date, those amounts will be added to the amounts due and owing under the Real Estate Note.   The FMUB New Notes will be secured by all security interests in the FMUB Collateral in effect as of the Petition Date, the post-petition Liens granted by the Court in the Final Cash Collateral Order, and the Mortgages granted to FMUB by Ballweg on the Ballweg Real Estate.

On the Effective Date, Maunesha will grant to FMUB valid and perfected security interests in its personal property, including, but not limited to equipment, livestock, accounts, and farm products, which interests will be junior to BMO's interests in the personal property. Except to the extent expressly modified by this Plan, all loan documents between FMUB and Maunesha shall remain in full force and effect.   Maunesha will execute any other documents reasonably requested by FMUB to effectuate the terms of the Plan.   Maunesha will continue to be obligated for all costs and expenses related to the FMUB Secured Claim and the Ballweg

Real Estate under the assumed Farm Lease, including the monthly escrow with FMUB for property taxes.  The property tax escrow shall be paid directly to FMUB by milk assignment. FMUB shall retain all Liens in the FMUB Collateral securing repayment of the FMUB Secured Claim as long as there is any balance owing on the FMUB Secured Claim.  The Debtor reserves the right to prepay the balance due on the FMUB Secured Claim at any time after the Effective Date provided the payment can be made without jeopardizing the payments due under the Plan. The FMUB Secured Claim is impaired under the Plan.

**4.3    Class Three (SBA Secured Claim).**

On the Effective Date, SBA will have an outstanding principal balance of $624,960, plus accruing interest, and unpaid and accruing administrative fees as set forth_in an amortization schedule provided to Maunesha at the inception of the loan ("SBA Administrative Fees").  During the Case, Maunesha paid the monthly interest only to SBA but did not pay any of the SBA Administrative Fees.   Maunesha estimates the unpaid post-Petition SBA Administrative Fees due at confirmation will be $8,412.76 ("Post-Petition SBA Administrative Fees").  SBA Administrative Fees will continue to accrue post-Confirmation ("Post-Confirmation SBA Administrative Fees"). The SBA Secured Claim will be paid under the Plan as follows:

a.    Principal balance of $624,960 payable at 3.0% per annum amortized over 20 years with monthly payments of principal and interest of at least $3,466.02;

b.    The Post-Petition SBA Administrative Fees and the Post-Confirmation SBA Administrative Fees will be held until the balance of the SBA Secured Claim is paid in full under the terms of the Plan.

The SBA Secured Claim will be due in full on the first day of the 61st month after the Effective Date. Payments will commence in the first full calendar month following the Effective Date, provided that there is no gap between the last adequate protection payment under the Final Cash Collateral Order (during the pendency of this Case) and the first payment against the SBA Secured Claim post-Confirmation Date. In the event there are additional fees or expenses owed to SBA on the Effective Date, those amounts will be added to the balance and paid at the end of the term. The SBA Secured Claim will be secured by all security interests in the SBA Collateral in effect as of the Petition Date and the post-petition liens granted by the Court in the Final Cash Collateral Order, and by the Mortgage granted to SBA by Ballweg on the Dairy Facility, subject only to the Third Party Agreement between SBA and FMUB. Except to the extent expressly modified by this Plan, all loan documents between SBA and Maunesha shall remain in full force and effect. Maunesha will execute any other documents reasonably requested by SBA to effectuate the terms of the Plan. Maunesha will continue to be obligated for all costs and expenses related to the SBA Secured Claim and the Dairy Facility under the assumed Farm Lease. SBA shall retain all liens in the SBA Collateral securing the repayment of the SBA Secured Claim as long as there is any balance owing on the SBA Secured Claim. The Debtor reserves the right to prepay the balance due on the SBA Secured Claim at any time after the Effective Date provided the payment can be made without jeopardizing the payments due under the Plan. The SBA Secured Claim is impaired under the Plan.

**4.4    Class Four (Agri-Max Secured Claim).**

As of April 1, 2022, the Agri-Max Secured Claim was $111,745.94. Maunesha will continue to make the monthly contract payments of principal and interest to Agri-Max until

20

confirmation of the Plan pursuant to the Final Cash Collateral Order. On the Effective Date, the balance on the Agri-Max Secured Claim shall be paid with interest at 5.25% per annum amortized over 5 years with the first payment due in the first full month following the Effective Date. The estimated amount of the monthly payment is $1,978.44. Agri-Max shall retain all liens in the Agri-Max Collateral securing payment of the Agri-Max Secured Claim as long as there is any balance owing on the Agri-Max Secured Claim. The Debtor reserves the right to prepay the balance due on the Agri-Max Secured Claim at any time after the Effective Date provided the payment can be made without jeopardizing the payments due under the Plan. The Agri-Max Secured Claim is impaired under the Plan.

**4.5    Class Five (Ascentium Secured Claim).**

Maunesha pays Ascentium $4,456.69 per month. Ascentium's current principal balance on the Petition Date totaled $159,664.11, plus accruing interest. Maunesha paid the monthly contract payments of principal and interest to Ascentium during the Case under the Final Cash Collateral Order. The final monthly payment on the Ascentium contract is due approximately March 1, 2025. Maunesha will continue to make the monthly payments of principal and interest to Ascentium under its pre-Petition Date contract until the Ascentium Secured Claim is paid in full. Ascentium shall retain all liens in the Ascentium Collateral securing payment of the Ascentium Secured Claim as long as there is any balance owing on the Ascentium Secured Claim. The Debtor reserves the right to prepay the balance due on the Ascentium Secured Claim at any time after the Effective Date provided the payment can be made without jeopardizing the payments due under the Plan. Ascentium's Secured Claim is <u>not</u> impaired.

**4.6    Class Six (CNH Secured Claim).**

As of April 1, 2022, the balance due on the CNH Secured Claim under the Magnum Security Agreement totals approximately $106,000, plus accruing interest and two pre-petition delinquent

21

installments. The delinquent installments on the Petition Date will be added to the principal balance on the Effective Date and will be paid by the Debtor with interest at 3.74% per annum amortized over 60 months, in monthly installments of principal and interest of approximately $1,937.59.

As of April 1, 2022, the balance due on the CNH Secured Claim under the Turbo Security Agreement totals approximately $25,700, plus accruing interest and two pre-petition delinquent installments. Payments under the Turbo Security Agreement were to be completed by November 2023 if all made as scheduled. Maunesha will continue to make the monthly payments of principal and interest under the Turbo Security Agreement of $1,225.35, with the final payment of $1,224.85, until all payments have been made under the contract. Any delinquent pre-Petition Date installments will be added to the end of the contract term effectively extending the length of the contract until paid in full by the Debtor.

CNH shall retain all liens in the CNH Collateral under the CNH Documents securing payment of the CNH Secured Claim as long as there is any balance owing on the CNH Secured Claim. The Debtor reserves the right to prepay the balance due on the CNH Secured Claim at any time after the Effective Date provided the payment can be made without jeopardizing the payments due under the Plan. The CNH Secured Claim is impaired under the Plan.

**4.7    Class Seven (Caterpillar Secured Claim).**

Maunesha paid the final payment due under the Caterpillar Security Agreement during the Case pursuant to the Final Cash Collateral Order. However, in the event there are any fees or interest outstanding on the Caterpillar Secured Claim, those would be nominal. Maunesha will pay any fees or interest, on the later to occur of the Effective Date or the date 15 days after Maunesha's receipt of verification from Caterpillar of any additional amounts due. The Caterpillar Claim is <u>not</u> impaired under the Plan.

22

**4.8    Class Eight (non-priority Unsecured Claims).**

Allowed unsecured Claims will not receive any installment payments under the Plan. However, upon completion of the Plan, Maunesha will seek to refinance the Secured Claims, except for any Claims secured by valid purchase money security interests with balances being paid at that time.  Maunesha will seek an additional amount of $100,000, over the amounts necessary to pay BMO, FMUB, SBA and any creditors of Ballweg at the time of the refinancing ("Unsecured Pool").   The Unsecured Pool will be available to distribute to members of this Class on a pro rata basis. Maunesha's request for the additional loan for the benefit of this Class shall be subject to the underwriting requirements of the lender(s) with whom Maunesha is working at the time.  If the underwriting requirements, in the discretion of the lender(s), will not support a loan for that amount, Maunesha will request whatever lower amount the underwriting requirements support for the Unsecured Pool; provided however, that the amount of any such loan to be distributed must be at least $50,000.  Maunesha will notify the members of the Creditor's Committee in this Case of its attempts to obtain the additional loan for the benefit of this Class, including the number of lenders with whom Maunesha attempts to refinance and the final determination of the amount, if any, that Maunesha has been awarded for the Unsecured Pool.  Maunesha will make any payments to the Class within 30 days after closing on the refinancing loan by mailing to the members of this Class their pro rata share of any Unsecured Pool, together with a copy of the schedule detailing the payments being made to all members in the Class, to the addresses set forth in the mailing matrix in this Case, or to such other addresses that specific creditors have provided to Maunesha in writing. No payment less than $100 (Diminutive Amount) will be made to any Creditor in the Class. If Maunesha is not able to obtain an additional loan for the Unsecured Pool as part of its

refinancing efforts, Maunesha will send a short notice to the members of this Class informing them that it was not able to secure the additional funds from its refinancing efforts ("Rejection Notice").  Maunesha's obligation to this Class of creditors shall be satisfied either by the payment made to members of the Class from the Unsecured Pool or, if no proceeds are awarded as part of its refinancing efforts, then by the deposit of the Rejection Notice in the mail addressed to each creditor at the address provided on the mailing matrix in this Case, or such other addresses as specific creditors provide to Maunesha in writing.

### 4.9    Class Nine (Member Interests).

Dennis Ballweg, in consideration of the new value provided to Maunesha to implement and execute the terms of the Plan, will retain his Interests in the Reorganized Debtor as those Interests existed in the Debtor on the Petition Date.

## 5.    MEANS OF IMPLEMENTING AND EXECUTING THE PLAN

### 5.1    Power and Authority of the Reorganized Debtor.

All Property of the Estate and any Avoidance Actions will vest in the Reorganized Debtor on the Confirmation Date.  The Reorganized Debtor shall take possession of and manage the Property of the Estate and shall administer the provisions of the Plan.  The Reorganized Debtor shall have all the rights and powers of a trustee under Chapter 11 of the Code, pursuant to § 1107 of the Code.  The Reorganized Debtor may use, acquire, dispose of, settle, liquidate, sell or otherwise manage any property without further necessary approval from the Court.  The Reorganized Debtor may settle or compromise any action or objection without notice or Court Approval.

### 5.2    Operation of Debtor's Business.

The Reorganized Debtor shall have full authority to operate the Debtor's business pursuant to this Plan.  Distributions under the Plan shall be made from the continued operation

of the business and in the case of some administrative fees, from the funds escrowed during the Case under the Final Cash Collateral Order.  The Allowed Secured Claims will be paid in the ordinary course of business as reflected in the monthly cash flow budgets in Schedule 4.4B to the Disclosure Statement and pursuant to the terms of this Plan.

5.2.1   <u>The Herd Expansion Loan</u>.  The Debtor shall purchase up to 200 new head of cows to introduce into the herd and immediately increase its production.  During the last few months of 2021 and early part of 2022, the Debtor aggressively culled low producing cows from its herd and replaced them with fresh cows that immediately improved its production. The Debtor has determined that it needs to fill its facility with more productive cows to take advantage of the current favorable milk prices for the short term, and to increase its pounds per cow and overall production in the long term, to hedge against potential volatility in the milk price in the future.  The Debtor anticipates making the purchase in two or more batches, depending on the availability of quality cows on the market.  The Debtor has a few different sources with which it is comfortable for purchasing the cows.  While the Debtor's intent is to increase the herd size as soon after the Effective Date as practicable, the Debtor will pursue quality over quantity as it adds to the herd. The Debtor's plan budget and cash flow reflect the purchases in two batches but the actual purchase will depend on the availability of quality animals at any time the Debtor pursues the cow purchases.

Maunesha will obtain a loan from BMO of $240,000 ("Herd Expansion Loan") for the expansion of the herd, all proceeds of which will be deposited directly into the Herd Account. Maunesha shall use all proceeds of the Herd Expansion Loan, and any funds held on the Effective Date in the Herd Account solely and exclusively for the purchase of new cows. Maunesha shall provide BMO with the number of head and price per head of cows purchased

using funds from the Herd Account prior to purchase and will provide BMO with invoices or

other documentation of all cows purchased using funds from the Herd Account which show

the number of cows purchased and final price per animal.  The Herd Account may be closed

upon Maunesha's completion of the herd expansion as detailed in this Section.  The treatment

of the BMO Secured Claim under the Plan includes the Herd Expansion Loan.  BMO will have

the first Lien in the cows purchased and all replacements under its pre-petition security

interests that are continued in post-petition property under the Final Cash Collateral Order and

the Plan.

In consideration of Herd Expansion Loan and other consideration, and as new value

provided to the Debtor, Ballweg will guaranty the Debtor's Herd Expansion Loan and grant

BMO mortgages on the Dairy Facility and the Sun Prairie Land ("New BMO Mortgages"), as

detailed in Section 4.1, above.   The New BMO Mortgages will secure the full amount of

BMO's Secured Claim, including the Herd Expansion Loan and the BMO New Notes.  BMO's

mortgage on the Dairy Facility will be junior to the FMUB and SBA mortgages in effect on

the Petition Date, subject to the terms of the Intercreditor Agreement between BMO and

FMUB discussed herein.  SBA's loan documents require consent to any mortgage, including

junior mortgages granted on real estate in which it has a mortgage.  Upon confirmation of the

Plan, the requirement for SBA's consent to the New BMO Mortgages shall be deemed

satisfied.

As part of the Herd Expansion Loan, Maunesha, Ballweg, FMUB and BMO will enter

into a new Intercreditor Agreement to replace all prior agreements between the parties and to

address the respective rights of the Banks in relation to their respective Liens in Maunesha's

and Ballweg's respective assets, with such Intercreditor Agreement to be executed among the

parties on or before the Effective Date. Also as part of the herd expansion transaction, Maunesha and Ballweg will amend Exhibit B to the Farm Lease to require that all loan payments made by Maunesha to FMUB after the Effective Date will be made only in amounts approved by the Court as a component of the treatment of the FMUB Secured Claim in this Plan and Maunesha's assumption, as amended herein, of the Farm Lease.

According to BMO's appraisal obtained during the Case, the Ballweg Real Estate has equity of more than $2,957,000 over the FMUB and SBA mortgage liens. BMO had a mortgage as of the Petition Date upon the Bare Land adjacent to the Dairy Facility but not on the Dairy Facility or the Sun Prairie Land.

After the Herd Expansion and throughout the Plan Term, the Debtor will cull cows on a consistent schedule monthly or bi-monthly, and purchase replacements to keep the herd fresh and productive. The Debtor will use cull cow proceeds and cash from operations to purchase replacement cows during the term of the Plan.

As provided in sec. 5.4.4 below, Maunesha will provide a Livestock Inventory Certificate on a monthly basis. However, notwithstanding the foregoing, on the last day of each calendar quarter, with the first calendar quarter beginning January 1, 2023 and ending March 31, 2023, Maunesha will have a minimum herd size of total cows (lactating and dry) and a minimum herd size of total heifers ("Testing Date"). The minimum herd sizes will vary year-to-year as set forth below:

| | YEAR | | | | |
|---|---|---|---|---|---|
| | 2023 | 2024 | 2025 | 2026 | 2027 |
| | | | | | |
| Minimum Cow | 1033 | 1050 | 1045 | 1037 | 1048 |
| Minimum Heifer | 319 | 364 | 351 | 362 | 386 |

In the event Maunesha does not have these minimum herd sizes on a given Testing Date, Maunesha shall have 30 days to cure by increasing the herd size(s) to meet the minimum(s) required herein, and must provide proof of the same to BMO.

      5.2.2   <u>Ballweg Transfer of Equipment to Debtor</u>. The Debtor currently leases equipment under an oral agreement with Ballweg identified as the Case IH Mower, Kuhn Hay Merger and Claas Forge Harvester in which Farm Credit Services of America, PCA d/b/a Ag-Direct ("Ag-Direct"), holds perfected purchase money security interests.   See section 2.5.2.2.3.2 of the Disclosure Statement. As additional new value to the Debtor, Ballweg will make every effort to transfer this equipment to the Debtor, subject to the existing purchase money security interests.  Ag-Direct shall retain its purchase money security interests, Liens and priority in the equipment without the necessity of filing any UCC financing statement or other document to reflect the change in ownership of the equipment or to preserve such interests for as long as Ballweg continues to owe Ag-Direct money on its existing contracts. Ag-Direct's loan documents require consent before Ballweg can transfer the equipment. If Ag-Direct refuses to consent to the transfer on these terms, the Debtor will enter into a written lease with Ballweg under which it leases the equipment and pays rent equal to the Ag-Direct contract payments, insurance, taxes and repairs related to the equipment.  BMO has the second lien on the Mower, Merger and Harvester under valid UCC financing statements filed against Ballweg personally and will continue its liens and priority without the necessity of filing any UCC financing statement or other document to reflect the change in ownership of the equipment or to preserve such interests.  Nothing in this Plan shall relieve either Ag-Direct,

BMO, or any other creditor, from any requirement for filing timely continuation statements under the Uniform Commercial Code.

On the Effective Date, as additional new value to the Debtor, Ballweg will transfer to the Debtor any other machinery or equipment he owns personally that is used in the Debtor's dairy operation.  BMO has validly perfected first Liens in the Debtor's and Ballweg's personal property, which Liens and priorities shall continue without the necessity of filing any UCC financing statement or other document to reflect the change in ownership or to preserve its interests.

### 5.3    Post-Confirmation Management.

The Reorganized Debtor will operate under the direction of its sole member, Dennis Ballweg.  As provided in the approved Amended Disclosure Statement, dated May 19, 2022 at sec. 4.3 (Dkt. No. 195), from and after the Effective Date, Ballweg will be paid $5,000 per month to manage the Maunesha's operation and administer the Plan. The Reorganized Debtor will continue to contract with Compeer Financial for accounting and payroll assistance as needed from time to time, on reasonable terms consistent with past practices between the parties, as reflected in the budget attached to the Disclosure Statement. The Reorganized Debtor will continue to contract with one or more nutritionists to assist with the rations and diets for the herd in an effort to achieve premiums related to butterfat, protein and other components.  The Reorganized Debtor will continue to deliver manure to and obtain some bedding from Sunnyside Digester, LLC, an affiliate of the Debtor owned by Ballweg. The Reorganized Debtor will retain the services of other professionals as needed.

**5.4     Post-Confirmation Financial Reporting.**

The Debtor will provide financial reporting to the Banks and SBA during the term of the Plan including, but not limited to the following:

5.4.1.   Market based balance sheet, profit and loss statement, and a budget/actual comparison on a quarterly basis;

5.4.2.   Annual updated budget, provided to the Banks and SBA by December 1 of the year preceding the budget year;

5.4.3   Copies of all milk checks, with detail, on a monthly basis;

5.4.4   Livestock Inventory Certificate in a form acceptable to the Banks, on a monthly basis, certified to being accurate to the best of the Debtor's knowledge;

5.4.5   Copies of all federal and State tax returns, with all relevant schedules, annually within 15 days after such returns are filed;

5.4.6   Any other documents or reports reasonably requested by the Banks in an effort to obtain sufficient information to evaluate the Debtor's post-confirmation operations and continued viability, including an annual personal financial statement for Ballweg in a form acceptable to each of the Banks and SBA and filed tax returns from Ballweg.

**6.      RETENTION OF JURISDICTION**

**6.1     Post-Confirmation of the Court.**

Until the Chapter 11 Case is closed, the Court retains jurisdiction to ensure that the purpose and intent of this Plan are carried out, to hear and determine all Claims against the Debtor, and to enforce all causes of action that may exist on behalf of the Debtor.  In addition, the Court retains jurisdiction to amend or modify the Plan to the extent and under the

30

circumstances that the Court deems appropriate, as permitted by the Court and the Federal Rules of Bankruptcy Procedure.

Notwithstanding confirmation of the Plan or occurrence of the Effective Date, the Court also retains jurisdiction for the following purposes, to the extent necessary:

**6.2    Allowance and Liquidation of Claims.**

To hear and determine the allowability of all claims on which objections are filed, to liquidate any disputed, contingent or unliquidated claims and to determine any requests for payment of administrative expenses entitled to priority under §§ 364 and 507 of the Code

**6.3    Determination of Tax Liability.**

To hear and determine the allowability of any tax liability pursuant to § 505 of the Code;

**6.4    Applications by Professionals.**

To hear and determine any and all applications by professionals retained pursuant to Code §§ 327 and 1107 for compensation and reimbursement of expenses;

**6.5    Executory Contract Motions.**

To act with respect to motions regarding the assumption, assignment or rejection of any executory contract or unexpired lease of the Debtor pursuant to §§ 365 and 1123 of the Code and to determine allowability of any claims arising from the resolution of any such Motion;

**6.6    Plan Interpretation.**

To resolve controversies and disputes regarding the interpretation of the Plan;

**6.7    Plan Implementation.**

To implement and enforce the provisions of the Plan and enter orders in aid of confirmation and implementation of the Plan, including without limitation, appropriate orders: (i) to protect the estate and its successors and assigns from any creditor action; (ii) to direct the filing of any document required to be filed with any governmental authority; or (iii) to require

31

the turnover of property of the Debtor or to compel strict compliance with any rights to any property vested in the Estate;

**6.8    Plan Modification.**

To modify the Plan pursuant to § 1127 of the Code and applicable Bankruptcy Rules;

**6.9    Adjudication of Controversies.**

To adjudicate such contested matters and adversary proceedings as may be pending or subsequently initiated in the Court, including but not limited to, actions relating to the Estate;

**6.10    Injunctive Relief.**

To issue any injunction or other relief appropriate to implement the intent of the Plan, and to enter such further order enforcing any injunctions or other relief issued under the Plan or in the Confirmation Order;

**6.11    Correct Minor Defects.**

To correct any defect, cure any omission or reconcile any inconsistency or ambiguity in the Plan, the Confirmation Order, or any document executed or to be executed in connection therewith, as may be necessary to carry out the purposes and intent of the Plan, provided that the rights of any Holder of an Allowed Claim are not materially and adversely affected thereby;

**6.12    Post Confirmation Orders Regarding Confirmation.**

To enter and implement such orders as may be appropriate in the event the Confirmation Order is, for any reason, stayed, revised, revoked, modified, or vacated;

**6.13    Powers Granted Pursuant to the Code.**

To exercise all authority granted pursuant to the Code;

**6.14    Consummation.**

To implement the provisions of the Plan and enter orders in aid of confirmation and consummation of the Plan, including such orders as may be requested by the Debtor under the Plan;

**6.15    Final Decree.**

To enter a final decree closing the Chapter 11 Case.

Nothing contained in the Plan shall limit the Court's power to abstain or decline to exercise Jurisdiction over any matter described above, and if the Court exercises such power, any such matter may be heard before any State or Federal Court that may otherwise have competent jurisdiction over such matter.

**7.    SPECIAL LIQUIDATION REMEDY FOR BANKS.**

**7.1    Summary.**

This Liquidation Provision is intended to provide an orderly and predictable process for liquidation of Maunesha's assets, including, but not limited to equipment, livestock, and inventory, in the event Maunesha defaults under the Plan with respect to payments due to one or both of the Banks during the Plan Term.   The process and procedures outlined in this Section 7 are an alternative to the Banks' existing remedies against the Debtor and any guarantor of the Debtor's obligations to the Banks.   Nothing in this Section 7 shall limit or otherwise impair the Banks' rights and remedies under the Plan, their respective loan documents, in Law or equity, by statute or otherwise, and no remedy conferred upon the Banks herein is intended to be exclusive of any other rights and remedy.   Further, FMUB shall remain subject to the Third Party Lending Agreement between FMUB and SBA.

### 7.2    Delinquency and Default.

If Maunesha fails to make any payment scheduled under the Plan to a Bank within 10 calendar days after it is first due, that payment shall be deemed delinquent, provided the delay in payment is the result of Maunesha's actions and not the result of any administrative or timing issues related to the dairy's processing of Maunesha's milk check or the milk assignments given to the Banks.  If any two payments due to the same Bank are delinquent in a Plan year, or if any payment is not made within 15 days after it is first due, Maunesha shall be in default (Event of Default).

Upon an Event of Default, the aggrieved Bank shall provide notice of such default to Maunesha and the other Bank. Maunesha shall have 10 days from the date of such notice to cure the Event of Default and to provide written verification of the cure to the Banks. If Maunesha fails to cure, the Event of Default shall be grounds for the orderly liquidation of Maunesha's assets with proceeds payable to the Banks.  Maunesha will provide the Banks with its plan for an orderly liquidation of its assets within 30 calendar days of receipt from either Bank's demand for such liquidation plan and upon approval from the Banks, shall undertake the liquidation pursuant to its liquidation plan.  If Maunesha fails to deliver its liquidation plan to the Banks in the time required or the liquidation plan is otherwise unacceptable to one or both Banks, in their respective discretion, the Banks may seek appointment of a Liquidating Trustee.

### 7.3    Liquidating Trustee.

Upon the fruition of the conditions precedent to the appointment of a liquidating trustee set forth in section 7.2, either Bank may move the Court for the appointment of a Liquidating Trustee to take possession of all assets of Maunesha, to secure, account for, maintain and protect the value of said assets until such time as the assets can be liquidated.  Any motion for the appointment of a Liquidating Trustee must state the Event of Default upon which the

motion is predicated, and include a declaration, affidavit or other statement regarding the facts of the Event of Default. Upon appointment of the Liquidating Trustee, Maunesha shall turn over control and possession of all of its assets to the Liquidating Trustee.  The Banks shall propose a competent person to serve as the Liquidating Trustee to the Court, and provide the Court with the proposed terms for compensation, interim reporting and recordkeeping, use of cash collateral, and any other terms for service of the Liquidating Trustee acceptable to the Banks and the proposed trustee.  If the Banks cannot agree on a person, each Bank may propose a person and terms of engagement for the Liquidating Trustee and request the Court make the final decision in appointing the Liquidating Trustee to serve under this Plan.

**7.4     Powers and Duties of Liquidating Trustee.**

The Liquidating Trustee shall have the powers of the Reorganized Debtor. Further, the Liquidating Trustee may, and it is contemplated that the Liquidating Trustee will, conduct sales of Maunesha's assets in a commercially reasonable manner pursuant to the Wisconsin Uniform Commercial Code.   In its performance, the Liquidating Trustee may hire such professionals as necessary to complete the liquidation of Maunesha's assets, subject to the approved terms for service for the Liquidating Trustee approved by the Banks and the Court at its appointment.

**7.5     Liquidating Trustee's Use of Cash Collateral or Protective Advances.**

The Banks have Liens in substantially all of Maunesha's assets. The Banks have liens in Maunesha's cash collateral, and, may, but are not required to, allow the Liquidating Trustee to use the cash collateral to carry out the duties set forth herein.  Any funds advanced shall be added to the balance owed to the Bank that advanced the funds.

**7.6**      **Final Accounting.**

After the Liquidating Trustee has liquidated Maunesha's assets, the Liquidating Trustee shall compile a final accounting and submit the same to the Banks.  The final accounting shall incorporate the payments made to the Banks under the Plan and account for all proceeds of all assets liquidated by the Liquidating Trustee. In the event there are assets that are not capable of being sold, or are otherwise obsolete, the Liquidating Trustee may abandon such assets at the conclusion of its term.

**8.**      **EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

Except as otherwise provided in the Plan, or any other document or other agreement entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases of the Debtor shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtor, (2) expired or terminated pursuant to its own terms before the Effective Date,  (3) is the subject of a motion to reject filed on or before the Effective Date, or (4) is rejected under the terms of this section of the Plan.

**8.1**      **Rejected Executory Contracts and Unexpired Leases.**

Debtor rejects the following equipment leases:

(a)      CNH Industrial Capital America LLC: lease of the Case IH Optum 270 Tractor entered on 07/12/2018 and the lease of the Case IH Optum 300 Tractor entered on 11/15/2018.

(b)      Dennis Ballweg: lease of three Husky Spreaders, Models 6500 sold during the Case.

**8.2**      **Claim for Rejection Damages.**

A proof of claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 30 days after the Effective Date.  Any already-

36

filed proof of claim must be amended no later than 30 days after Effective Date to accurately reflect the extent of the claim arising from rejection. Any Claims, or amended claims, arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtor or the Reorganized Debtor, the Estate or its property without the need for any objection by the Reorganized Debtor or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of any Executory Contracts or Unexpired Leases shall be classified as Class Eight Unsecured Claims against the Debtor and shall be treated in accordance with this Plan.

**8.3    Assumed Executory Contracts and Unexpired Leases.**

Debtor assumes, and if applicable, assigns to the Reorganized Debtor, the following Executory Contracts and Unexpired Leases as of the Effective Date:

(a)    CNH Industrial Capital America LLC: lease of Case IH Optum Tractor 300 CVT entered on 09/30/2019.

(b)    Farm Credit Leasing Services Corporation d/b/a AgDirect: lease of 2013 Case IH Steiger 450 Tractor entered on 02/03/2021.

(c)    Dennis Ballweg: lease of Claas 930 Forage Harvester, and lease of Case IH DC161 Mower and Kuhn 900 Hay Merger.

**8.4    Cure and Effect of Assumption.**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under this Plan is in default shall be satisfied, under 11 U.S.C. § 365(b)(1), by Cure. If there is a dispute regarding (i) the nature of amount of any Cure, (ii) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (as that term is used in sec. 365(b)(1)) under the Executory Contract or Unexpired Lease to be assumed, or

37

(iii) any other matter pertaining to assumption, Cure shall occur within 15 days following the entry of a Final Order of the Bankruptcy Court resolving the dispute.

**Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.**

9.    **DISCHARGE, EXCULPATION AND INJUNCTIONS**

9.1    **Discharge of Debtor.**

As of the Effective Date, the rights afforded in the Plan shall be in consideration for and in complete satisfaction, settlement, payment, cancellation, and discharge of all claims and interests of any kind or nature whatsoever against the Debtor and the Reorganized Debtor or any of its assets as provided in § 1141 of the Code.  The discharge of the Debtor shall be effective as to each claim regardless of whether a Proof of Claim was filed, whether the claim is an Allowed Claim or whether the holder thereof votes to accept the Plan.

9.2    **Exculpation.**

**The employees, advisors, attorneys, professionals, or agents of the Debtor do not have or will not incur any liability to any Creditor, Claimant or the Debtor for any act or omission in connection with, related to, or arising out of, the Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, or the property to be distributed under the Plan, except for willful misconduct, and**

**in all respects, the employees, advisors, professionals, and agents are entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan.**

9.3    Injunction.

**Except as otherwise provided in the Plan and except with respect to actions to enforce the terms of the Plan, for willful misconduct or for acts or omissions taken in bad faith, all Persons who have filed a Claim or were scheduled by the Debtor as Creditors and who have held, hold or may hold Claims, are permanently enjoined after the Effective Date from:** (a) prosecuting any claim, demand, debt, right, cause of action, liability or interest against or with respect to the Reorganized Debtor which has been released, waived or terminated pursuant to this Plan; (b) enforcing, attaching, collecting or recovering in any manner, any judgment, award, decree or order against the Reorganized Debtor or its property; (c) creating, perfecting or enforcing any Lien or encumbrance against the Reorganized Debtor or its property; (d) asserting a right of setoff, right of subrogation or right of recoupment of any kind against any debt, liability or obligation due to the Reorganized Debtor or its property; (e) commencing or continuing any action, in any manner or in any place, that does not comply with, or is inconsistent with, the provisions of the Plan; and (f) commencing or continuing, in any manner, any action or other proceeding against the Reorganized Debtor or its property.

9.4    **Third Party Injunction Related to Guaranteed Creditors.**

**As long as the Debtor is not in default under the payment terms of the Plan, the Guaranteed Creditors are enjoined from undertaking any attempt to collect any portion of their respective Claims during the Plan Term from Ballweg or from any property in which Ballweg has an interest, except to the extent a Guaranteed Creditor has a valid**

**right of setoff under Wisconsin law related to the Guaranteed Creditor's continuing**

**obligation to Ballweg under a contract or program in existence prior to the Petition Date.**

**10.     RULES OF INTERPRETATION**

For purposes of this Plan:

10.1     whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural;

10.2     unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions;

10.3     unless otherwise provided in the Plan, any reference in the Plan to an existing document or exhibit means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan;

10.4     unless otherwise specified in the Plan, any reference to an entity as a holder  of a Claim or Interest includes that entity's successors and assigns;

10.5     the words "hereof," "herein," and "hereunder" and words of similar import when used in this Plan shall refer to this Plan as a whole and not to any particular provision of this Plan;

10.6     unless otherwise specified in the Plan, the words "Article," "Section,"  "Clause," and "Exhibit" refer to articles, sections, clauses and exhibits of or to this Plan; and

10.7     the rules of construction set forth in § 102 of the Code shall apply.

## 11.    MISCELLANEOUS

### 11.1    Headings.

The headings contained in this Plan are for convenience of reference only and shall not limit or otherwise affect in any way the meaning or interpretation of the Plan.

### 11.2    Singular/Plural.

All references in this Plan to the singular shall be construed to include references to the plural and vice versa.

### 11.3    Gender.

All references in this Plan to any one of the masculine, feminine or neuter genders shall be deemed to include references to both such other genders.

### 11.4    Computation of Time Periods.

In computing any period of time prescribed or allowed by this Plan, the day of the act, event or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or a legal holiday, in which event the period shall run until the end of the next day that is not one of the aforementioned days.

The Debtor respectfully requests confirmation of this Plan of Reorganization.

Dated this 8th day of July, 2022.

MURPHY DESMOND S.C.
Attorneys for Debtor

By:

Jane F. (Ginger) Zimmerman
State Bar No. 1012103
jzimmerman@murphydesmond.com
Nicole I. Pellerin
State Bar No. 1078892
npellerin@murphydesmond.com
33 East Main Street, Suite 500
P.O. Box 2038
Madison, WI  53701-2038
(608) 257-7181

MAUNESHA RIVER DAIRY, LLC

By:

Dennis Ballweg, its Sole Member

42